UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
No. 23-CR-160 (NEB/JFD)

___

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | **MEMORANDUM IN SUPPORT OF JADARIUS WRIGHT'S MOTION TO SUPPRESS EVIDENCE OBTAINED BY SEARCH AND SEIZURE** |
| vs. | |
| JADARIUS WRIGHT (38), | |
| Defendant. | |

___

## INTRODUCTION

Defendant Jadarius Wright, by and through his undersigned counsel, submits this memorandum in support of his Motion requesting the Court to Order suppressed various evidence obtained by search and seizure.

The government was investigating a suspect they did not know the name of. During that investigation, they conducted Constitutionally unreasonable searches. They erroneously came to believe their suspect was Mr. Wright. And then, while attempting to rectify that mistaken belief, they seized additional items (some without lawful cause) and conducted additional searches (some unreasonable). Mr. Wright moves to suppress all of the searches and seizures outlined below. An evidentiary hearing is required to address these issues.

# FACTS[1]

*The status of the government's investigation in the Spring of 2022—as relevant to Mr. Wright.*

In April 2022, the government had suspicion about a phone number with the area code 254. It appeared to suspect the user of the 254-xxx-xxxx phone number was engaged in drug trafficking activity. (00129484; 00121102). It did not, however, have any link between the 254-area-code phone number and Jadarius Wright—the information it had at the time indicated someone else was the user of that phone. (00129484).

On April 15, 2022, the government obtained a warrant authorizing the government to obtain "Pen Register, Trap/Trace, Electronic Tracking Device, GPS and Triangulation Location" on the 254-area-code phone number. (00129485). The warrant is contained at pages 00157590-00157602. It did not name Jadarius Wright. The government conducted that surveillance.

From that surveillance the government observed the 254-area-code number phone was in the city of Minneapolis in May somewhere near the Radisson Hotel located at 609 3rd St. S., Minneapolis, MN 55415. (00129487). The electronic surveillance indicated while the phone was usually in Arizona, it was near that hotel over a six-day span in May. (00129487).

---

[1] The information contained in the Facts section is provided from the government's point of view at the time of the searches as articulated in the discovery. Citations are to Bates stamped discovery materials.

The descriptions of portions of the facts provided are not confidential and are compliant with this Court's protective order.

Armed with that information, on May 11, 2022, an FBI agent served an administrative subpoena on the property manager for the Radisson Hotel in which it sought the names, addresses, and information for *all* registered guests of the hotel. (00123260; 00121078). This (along with the electronic surveillance conducted by April 15, 2022) warrant are key searches at issue here, as all later government inquiry relied on it. Mr. Wright contends these were illegal searches.

The Hotel complied with the subpoena and disclosed the information of all the Hotel guests, including Mr. Wright. (00129487). This appears to be the first time the government agents heard or saw the name Jadarius Wright. (*See generally* 00123260). The government then presumably obtained DMV information for all the registered guests—it at least did so from the Arizona DMV for Mr. Wright (who holds an Arizona Driver's License). (00129487). On May 10, 2023, law enforcement obtained a second signed search warrant for GPS and cell site data for the phone. (00121119).

Law enforcement then seemed to have flagged Mr. Wright for travel at the MSP airport. On May 12, 2022, Mr. Wright had checked bags and was about to board a Sun Country flight. MSP airport K-9 police conducted dog-sniffs on his checked luggage, the dog alerted for drugs, and the bags were seized and later searched pursuant to warrant. (00123262; 00129488).

Meanwhile, at the gate, two federal agents began speaking with Mr. Wright. During the conversation one of the agents called the 254-area-code number. Investigative reports indicate an agent believed he observed Mr. Wright retrieve an iPhone from his pants pocket as if it was ringing on silent, the agent observed the screen indicated a call

from an unknown number, the agent observed Mr. Wright ignore the call and put it back in his pocket. The agent then subsequently seized that phone and another phone from the person of Mr. Wright. (00129488). The legal basis for those seizures is not clear as Mr. Wright was not arrested that day, and Mr. Wright challenges those seizures as unlawful.

During that conversation, the same drug dog who alerted earlier on the checked luggage apparently conducted an open-air sniff of Mr. Wright's carry-on bag, (00121079), and the dog apparently alerted again. Mr. Wright's carry-on was seized and later (after a warrant was obtained) searched. (00121079). The facts preliminarily indicate these searches were pretextual—the dog indicated drugs were present in three pieces of luggage, but no drugs were found in any of the three. (00123262).

In any event, Mr. Wright was released without being arrested. The government went on to investigate the case, later obtaining warrants and conducting searches of the luggage (as indicated above) and the phones. (00121118). Mr. Wright was indicted in November 2023, about 18 months after the airport encounter. He was arrested without incident that same month. (00151815).

The government later sought and obtained a warrant to search the two cell phones. It ultimately searched them pursuant to a warrant it obtained about nine months after the phones were unlawfully seized. (00129497). The government followed this procedure as it attempted to search this phone shortly after it was seized (pursuant to warrant) but was technologically unable to do so. So it kept the phone until it believed it cleared that technological hurdle, then sought and obtained a second warrant.

Discovery also indicates law enforcement obtained a warrant to access a Snapchat account it believed Mr. Wright had. That is contained in pages 00129604-00129640 of the discovery. That warrant was signed by this Court—the Honorable Magistrate Judge John F. Docherty—on March 17, 2023. The application relies on "open source" research that is not provided nor explained in the warrant application. That is discussed below, in Argument Section 5.

## *Argument*

1. **The government's electronic surveillance conducted by April 15, 2022 and May 10, 2022 warrants was unlawful. It, and all derivative evidence should be suppressed.**

The electronic surveillance was constitutionally infirm—despite the fact that warrants were issued—as the searches were overbroad, non-particularized, and the warrant applications did not, on its four corners, provide probable cause.

The searches were first illegal as it was overbroad given the nature of the property rights infringed upon. The starting point for any search is the Fourth Amendment's specificity requirement. As put in *United States v. Towne*, 997 F.2d 537, 544 (9th Cir. 1993), "Specificity has two aspects: particularity and breadth. Particularity is the requirement that the warrant must clearly state what is sought. which requires the warrant to be "sufficiently definite to enable the searching officers to identify the property authorized to be seized." *United States v. Horn*, 187 F.3d 781, 788 (8th Cir.1999). "The degree of specificity required will depend on the circumstances of the case and on the type of items involved." *Id.*

Breadth "deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." *Towne*, 997 F.2d at 544. Thus, even if sufficiently particular, a warrant can be overbroad where, put simply, too broad a swath of information is seized. For example, in *United States v. Hill*, 459 F.3d 966 (9th Cir. 2006), the Ninth Circuit held a search of computers violated a person's Fourth Amendment rights, even when conducted pursuant to a warrant, because "although the warrant in this case authorized a wholesale seizure, the supporting affidavit did not explain why such a seizure was necessary." *Id*. at 975. Too much information was seized.

*Hill* emphasized that "[t]he Constitution is clear; a magistrate may authorize a search of a location only if officers establish probable cause to believe evidence of a crime may be found there. Probable cause means only a 'fair probability,' not certainty, and requires consideration of the totality of the circumstances." *Id*. at 970. *See also United States v. Ali*, Criminal No. 22-129 at *2-*3 (D. Neb. Dec. 6, 2023) (ultimately applying the good faith exception, but noting:

> The sheer breadth of the records sought in this case, which include various types of detailed location and correspondence data covering a range of over fifteen months, heightens the Court's concerns about the warrant's lack of detail as to the suspected offenses and their timeline […]
>
> Further, the fact that such phone-record searches are executed by cellular providers, who are unlikely to be privy to the broader investigatory purposes of a search, exacerbates the dangers presented by a warrant's lack of particularity.

*Id*.

In this case, because of the way people are now tracked through cellphones, the search and seizures went well beyond the Constitution's directives. The warrants authorized a deep and personal intrusion by law enforcement, including:

- authorizing the installation and use of a pen register, a device that tracks outgoing signals from the cellphone;

- authorizing the installation and use of a trap/trace device, a device that captures incoming signals to the cellphone;

- using these devices to record "all dialing and signaling information … of all communications originating from or directed to [the phone number] and any related mobile phone numbers supported by T-Mobile…"

- authorizing the covert installation and use of an electronic tracking device, GPS technology, and "E911" location technology; all of which are tools to track where a person is at any given time. GPS tracking allows the phone – and therefore, the phone's user – to be tracked to within a few feet.
(E911 is a remarkably powerful tool – E911 is a system that was required to be loaded onto all cell phones to safeguard citizens in the event of an emergency. If a person dials 911 to get emergency police, fire, or medical aid from any cellphone, that phone will send its location to the emergency servicer. Law enforcement tap into this tool to track any person with a cellphone at any time. The person being searched does not have to make a 911 call – or any call at all – they just need to have the phone on);

- directing T-Mobile to, if necessary, install software on the subject phone so that the government could utilize the covert monitoring tools above;

(00157598-00157600).

The April 2022 warrant also directed T-Mobile to provide the cell site locations activated during the 60-day warrant period, the numbers dialed or pulsed, voice mails received, text messages sent and received, incoming numbers, historic call detail records, subscriber personal and billing information, an engineering map showing all cell-site tower locations, addresses, sectors, and orientations—and much more. (*Id.*)

As explained by Stephanie Pell and Christopher Soghoian, *Can You See Me Now?: Toward Reasonable Standards for Law Enforcement Access to Location Data That Congress Could Enact*, 27 Berkeley Tech. L.J. 117, 128 (2012):

> Wireless service providers retain detailed logs for diagnostic, billing, and other purposes. These logs reveal the calls and Internet connections made and received by wireless subscribers, as well as detailed technical information regarding the cell sites that were used. Such logs generally only reveal which particular cell site a phone was near at the time of the call. Data from multiple towers can be combined to pinpoint (or "triangulate") a phone's latitude and longitude with a high degree of accuracy (typically under fifty meters).

Put more simply, this allows the government to see where the person holding the phone has been for the time period. This combination of tools is enormously powerful – and enormously invasive. It allowed the government to (assuming, as they now assert, that this was Mr. Wright's phone), track everywhere Mr. Wright had gone, track everywhere he was going to go in the future, track the calls, text messages, and voicemails he sent, and track who his associates were. The April 2022 warrant authorized such for a two-month period. This is too invasive a tool for the job. It did not comply with the Fourth Amendment's demands as articulated in *Hill* and other cases.

Finally, the four corners of the warrant affidavits did not provide probable cause for the searches. The probable cause section of the April 2022 warrant application (contained at paragraph 3, beginning at page 00157592) is sparse. It contains no information about Mr. Wright, and the small amount of detail it contains about the suspect phone number does not provide the cause needed for such an intrusive tool as the

government received. Mr. Wright thus respectfully submits this Court issue an Order suppressing this evidence.

Mr. Wright also respectfully submits this Court should issue an Order suppressing all evidence derivatively obtained from these searches. Where evidence is obtained as a product of an earlier illegal act, it is to be suppressed under the exclusionary rule. *See, e.g.*, *Murray v. United States*, 487 U.S. 533, 536 (1988) (citations omitted). "[T]he exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" *Id*. at 536-537 (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939); and citing *Wong Sun v. United States*, 371 U.S. 471, 484-485 (1963)). All the later evidence is derivative of these; all should be suppressed.

2. **_The government's obtaining of Mr. Wright's private information by serving an administrative subpoena on the Radisson Hotel on May 11, 2022, was an unlawful search. It, and all derivative evidence (which is all evidence against Mr. Wright subsequently obtained) should be suppressed._**

Mr. Wright references and specifically incorporates herein the facts and argument asserted above.

The defense asserts the hotel administrative subpoena was—first— derivative of the unlawful electronic phone surveillance challenged above, and—second—a warrantless search of property in which he had a reasonable expectation of privacy.

9

The government had a suspicion that someone at the Minneapolis Radisson Hotel was engaging in some kind of criminal activity. It investigated that suspicion by issuing an administrative subpoena on May 11, 2022 in which it directed the Radisson Hotel to turn over the information of everyone who was staying there. The Hotel complied. This was apparently the first time law enforcement saw the name Jadarius Wright or the associated information. And they bootstrapped that search to conduct the rest of their investigation.

Exactly what information the government obtained is not contained in the discovery. But, from the discovery, it appears the government obtained Mr. Wright's personal information. That information was private—and Mr. Wright had a reasonable expectation of privacy in it—yet the government obtained it without a warrant and where no exception to the warrant requirement applied. This was unconstitutional. *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) ("in order to claim the protection of the Fourth Amendment, a [person] must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable").

It is settled that a registered hotel guest clearly has a reasonable expectation of privacy in his hotel room. *See Stoner v. California*, 376 U.S. 483, 490 (1964). *Stoner* is clear not only that "a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures" but also that the Fourth Amendment protection is not "left to depend upon the unfettered discretion of am employee of the hotel." *Id*.

There are some cases that suggest a person has no reasonable expectation of privacy in information they provide to a hotel operator where that hotel operator later

10

turns that information over to police. *See, e.g., United States v. Cormier*, 220 F.3d 1103, 1108 (9th Cir. 2000). Counsel has not found Eighth Circuit precedent on this issue and contends—first, that cases which reach that ruling are simply inaccurately decided, especially in light of *Carpenter v. United States*, 138 S.Ct. 2206 (2018) and its progeny, which held that warrants were required to obtain Cell Site Location Information "voluntarily provided" to a third party because of the privacy interests in obtaining this information. Counsel second contends that the facts of cases like *Cormier* are likely to be different than the facts which will be developed here: in *Cormier*, the Ninth Circuit's analysis was based upon the logic that the data turned over in that case "did not contain highly personal information[.]" 220 F.3d at 1108. Although discovery is not clear, it appears likely that the Radisson *did* turn over highly personal information for Mr. Wright that law enforcement later used in its investigation of him.

This Court will obtain, through testimony at the hearing, clarity about what was obtained by law enforcement, how it was obtained, and how it was later used. Mr. Wright submits that such a hearing will show suppression is appropriate.

3. **The government's searches of Mr. Wright's three pieces of luggage, seized at the MSP airport after pretextual "dog sniff alerts" were unlawful.**

Mr. Wright references and specifically incorporates herein the facts and argument asserted above.

The defense asserts the luggage searches were—first—derivative of the unlawful searches challenged above, and—second—the product of an unreliable and pretextual dog sniff that did not establish probable cause.

11

On May 12, 2022, while Mr. Wright was traveling, a MSP-Airport-Police Dog named "Ozzy" sniffed three of his bags (two checked bags and one carry on). It apparently alerted on all three. Based on those alerts, law enforcement seized all three. (*See, e.g.,* 00129613, Paragraph 27). It later searched all three pursuant to a warrant issued by Hennepin County Judge Julie Allyn. All three bags contained no drugs, though $27,300 cash was found. (*See, e.g.,* 00129614, Paragraph 29). These alerts were unreliable, and the seizures (and subsequent searches) were unlawful and should be suppressed.

The Eight Circuit recently affirmed the state of the law in *United States v. Perez*, 29 F.4th 975, 986 (8th Cir. 2022), beginning with the principle that "the framework courts should use to determine whether a drug dog sniff is reliable enough to give police officers probable cause to conduct a search .... is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." (*Id*. (quoting *United States v. Holleman* , 743 F.3d 1152, 1157 (8th Cir. 2014) (internal quotations omitted).

The *Perez* Court went on to affirm that—while a dog certification or training protocol can give a *presumption* of probable cause from an alert—"This presumption may be overcome if a defendant can show, either through cross-examination or introducing his own fact or expert witness, the inadequacy of a certification or training program or that **the circumstances surrounding a canine alert undermined the case for**

12

*probable cause*." *Id*. (emphasis added) (quoting *United States v. Gonzalez*, 781 F.3d 422, 429 (8th Cir. 2015)).

The luggage searches conducted should be suppressed as the dog used lacked the requisite accuracy and reliability set forth in *Florida v. Harris*, 568 U.S. 237 (2013) to establish probable cause for the search of the luggage pieces. Law enforcement's obtaining a warrant for the searches did not fix the problem: when they did so, they relied on Courts' presumptions that police dogs are reliable. "Ozzy" was not reliable, and the affiant should have informed the Court the reality of that. Suppression is warranted, or—at minimum—a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978) to determine the import of information as to the dog's reliability, which Mr. Wright specifically requests.

4. **The government's searches of Mr. Wright's two phones, seized at the MSP airport approximately one year earlier without cause, were unlawful.**

Mr. Wright references and specifically incorporates herein the facts and argument asserted above. The defense asserts the phone searches were—first—derivative of the unlawful searches above, and—second—unlawful as the phones were seized without legal authority.

On May 12, 2022, Mr. Wright was briefly questioned at the MSP Airport. The questioning agents did not arrest him and did not charge him with anything. In fact, he was released and able to board. The agents did, though, seize two cell phones from Mr. Wright.

These seizures were conducted without a warrant, and without any exception to the warrant requirement. Mr. Wright did not consent to the search, was not arrested, and

13

the plain view exception does not apply—for this exception to apply, "not only must the item be in plain view; its incriminating character must also be 'immediately apparent.'" *Horton v. California*, 496 U.S. 128, 136, 137 (1990). *Horton* discussed the Court's precedent in *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), "Thus, in *Coolidge,* the cars were obviously in plain view, but their probative value remained uncertain until after the interiors were swept and examined microscopically.") *Id*. Comparable to here, the government did not want the phone, it wanted the information *inside* the phone, which was digitally "swept and examined microscopically" upon a forensic search the following February. This is not a situation where the "plain view" exception is to apply.

Likewise, these were not seizures pursuant to a "border search" in which property is briefly seized, examined, and then returned to the owner. Such seizures are necessarily very brief. *See, e.g., United States v. Place*, 462 U.S. 696, 707 (1983) (declaring unreasonable an airport seizure of a suspected drug trafficker's luggage for 90 minutes under the facts of the case).

Instead, agents simply took his phones and kept them. Two weeks later, law enforcement sought and received a warrant to search the phones from the Honorable Magistrate Judge Jon T. Huseby. Later obtaining a warrant does not "cleanse" the unreasonable seizure that had already occurred. Further, law enforcement did not inform the Honorable Judge Huseby the two cell phones were seized without valid legal authority – an appropriate matter for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), which Mr. Wright specifically requests.

The phone seizures are simply not supported by precedent. *See, e.g., United States v. Cotterman*, 637 F.3d 1068, 1070 (9th Cir. 2011) ("Still, the line we draw stops far short of 'anything goes' at the border. The Government cannot simply seize property under its border search power and hold it for weeks, months, or years on a whim."). Apparently law enforcement was unable to search the phones after they were seized. So they kept them.

Then, in February 2023, law enforcement believed the state of technology had progressed and they would be able to search the phones. They sought and obtained a second search warrant, signed by the Honorable Magistrate Judge Elizabeth Cowan Wright authorizing their search. As before, this warrant also did not "cleanse" the original unlawful seizure nearly a year earlier. Law enforcement also did not tell the Honorable Judge Cowan Wright the phones were seized without legal cause. Nevertheless, law enforcement conducted the searches. These searches were unlawful.

Mr. Wright also submits the course of conduct law enforcement took with the Honorable Judge Cowan Wright is an appropriate basis for a *Franks* hearing, and submits evidence obtained from the phone searches should be suppressed, along with (as briefed above) all derivative evidence.

5. **<u>The government's searches of Mr. Wright's Snapchat account pursuant ot an March 17, 2023 warrant was unlawful.</u>**

Mr. Wright references and specifically incorporates herein the facts and argument asserted above.

The defense asserts the Snapchat search was—first—derivative of the unlawful searches above, and—second—unlawful as the warrant application did not, on its four corners, provide probable cause.

On March 17, 2023, law enforcement sought and received a warrant, from the Honorable Magistrate Judge John F. Docherty to search the Snapchat Account associated with the username "RICHOFFSOLES" and seize evidence therein. The affidavit asserted that this was Mr. Wright's Snapchat account.

Snapchat is a very popular phone application. The core functionality associated with Snapchat is the ability for people to send and receive text, audio, and video messages. These messages can be stored on the sender's phone, the reciever's phone, both phones, or neither phone. Individual users have their own Snapchat accounts.

The warrant affidavit asserted that Mr. Wright owned and utilized the "RICHOFFSOLES" account and asserted that there was probable cause to believe this account contained evidence of illegal activity. Searches conducted pursuant to warrants are typically constitutional – but this is not the case where probable cause is plainly insufficient from the face of the warrant affidavit.

In this case, the warrant affidavit was insufficient to establish probable cause to search the property of Mr. Wright.

The affidavit began by laying out the basic history of the case, as summarized in the preceding sections of this memorandum. This background information did not support a theory that the "RICHOFFSOLES" account would contain evidence.

The support for that proposition, instead, came from law enforcement extracting Snapchat data (pursuant to the searches challenged above) and finding a conversation between two users: one with the display name "nogoodlos", the other with the display name "mrwrightguy" (and the username "ijumpwright"). Law enforcement believed that the conversation was suspicious as explained in the application. The name "RICHOFFSOLES" did not appear in that conversation. As to the name "RICHOFFSOLES", the affiant wrote that he:

> "conducted an open-source Snapchat search for the username, ijumpwright. which had negative results. Your Affiant repeated the same search for the display name. mrwrightguy, which had a positive result with username: RICHOFFSOLES. During the examination of the seized Apple iPhone your Affiant learned that RICHOFFSOLES is saved as an account name for Snapchat"

(paragraph 34, Bates 00129615). This was the asserted link between "RICHOFFSOLES" and Mr. Wright.

This "open source Snapchat search" was not explained to the Court in the warrant affidavit. There is no indication the search was reliable, nor information about how the search was conducted, nor what it showed. Nor is there information about the meaning or context behind the assertion that "RICHOFFSOLES is saved as an account name for Snapchat"—the Court was not explained what this means. The bare-bones, conclusory assertions were plainly insufficient for the Court to independently determine probable cause. *United States v. Grant*, 490 F.3d 627, 634 (8th Cir. 2007) ("The Supreme Court has said that while courts should use a 'flexible, commonsense standard' for probable cause, 'bare bones affidavits' are insufficient.") (*quoting Illinois v. Gates*, 462 U.S. 213,

17

239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). *See also United States v. Pope*, 467 F.3d 912, 920 (5th Cir. 2006) ("[E]xamples of 'bare bones' affidavits include those that merely state that the affiant 'has cause to suspect and does believe' or '[has] received reliable information from a credible person and [does] believe' that contraband is located on the premises.") (alterations in original) (citations omitted).

This was an example of a "trust me" affidavit designed to conduct a fishing expedition; it was wholly insufficient to establish probable cause. When a "magistrate judge relie[s] solely upon the supporting affidavit to issue the warrant, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999) (*quoting United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995) (quotations omitted)). The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV.

This application was plainly deficient to establish probable cause—the good faith exception cannot save it. The search was unreasonable. Evidence from the "RICHOFFSOLES" Snapchat warrant should be suppressed.

### *Conclusion*

Under the foregoing arguments, Mr. Wright respectfully submits that the above-noted evidence obtained by search and seizure should be suppressed.

Dated: May 26, 2024                    /s/ Ian S. Birrell

                                                Andrew S. Birrell (Attorney No. 133760)
Ian S. Birrell (Attorney No. 0396379)
Birrell Law Firm PLLC
333 South 7th Street, Suite 3020
Minneapolis, MN 55402
Phone: (612) 238-1939
andy@birrell.law | ian@birrell.law
*Attorneys for Defendant*